Approved: _____
DAVID W. DENTON, JR. / KIMBERLY J. RAVENER
Assistant United States Attorneys

Before:  HONORABLE JAMES L. COTT
United States Magistrate Judge
Southern District of New York

**21 MAG 4447**

- - - - - - - - - - - - - - - - - - X
                                     :  **COMPLAINT**
UNITED STATES OF AMERICA             :
                                     :  Violations of
            - v. -                   :  50 U.S.C. § 1705;
                                     :  18 U.S.C. §§ 1956 and 3238.
KWEK KEE SENG,                       :
                                     :  COUNTY OF OFFENSE:
            Defendant.               :  NEW YORK
                                     :
- - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

KEVIN SAMAROO, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation (the "FBI"), and charges as follows:

COUNT ONE
(Conspiracy to Violate the
International Emergency Economic Powers Act)

1.  From at least in or about February 2018, up to and including in or about March 2020, in the Southern District of New York, Singapore, North Korea, and elsewhere, and in an offense begun and committed outside of the jurisdiction of any particular State or district of the United States, KWEK KEE SENG, the defendant, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to violate licenses, orders, regulations, and prohibitions in and issued under the International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701-1706.

2.  It was a part and an object of the conspiracy that KWEK KEE SENG, the defendant, and others known and unknown,

would and did provide and cause others to provide goods and services to and for the benefit of (i) the Democratic People's Republic of Korea ("DPRK" or "North Korea"), and (ii) specially designated nationals ("SDNs") Chong Rim 2, a/k/a "Saebyol," and Ocean Bunkering JV, without first obtaining the required approval of the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), in violation of 50 U.S.C. § 1705(a), 31 C.F.R. §§ 510.206(a), 510.212(b), and Executive Orders 13466 and 13722.

3. It was further a part and an object of the conspiracy that KWEK KEE SENG, the defendant, and others known and unknown, would and did evade and avoid, and attempt to evade and avoid, the requirements of U.S. law with respect to the provision of goods and services to and for the benefit of the DPRK, Chong Rim 2, a/k/a "Saebyol," and Ocean Bunkering JV, in violation of 50 U.S.C. § 1705(a), 31 C.F.R. §§ 510.212(a)-(b), and Executive Orders 13466 and 13722.

(Title 50, United States Code, Section 1705;
Executive Orders 13466 and 13722;
Title 18, United States Code, Section 3238.)

COUNT TWO
(International Money Laundering Conspiracy)

4. From at least in or about February 2018, up to and including in or about March 2020, in the Southern District of New York, Singapore, North Korea, elsewhere, and in an offense begun and committed outside of the jurisdiction of any particular State or district of the United States, KWEK KEE SENG, the defendant, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, did knowingly combine, conspire, and agree with each other and with other persons known and unknown to commit offenses against the United States in violation of Title 18, United States Code, Sections 1956 and Section 1957.

5. It was a part and object of the conspiracy that KWEK KEE SENG, the defendant, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument or funds involving the proceeds of specified unlawful activity, to wit, violations of IEEPA, from a place outside the United States to or through a place in the United States and from a place in the United States to or through a place outside the United States, with the intent to promote the carrying on of specified unlawful

2

activity, to wit, the illegal export of services to the DPRK and to North Korean SDNs as charged in Count One of this Complaint, in violation of Title 18 United States Code, Section 1956(a)(2)(A).

6. It was further a part and an object of the conspiracy that KWEK KEE SENG, the defendant, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument or funds involving the proceeds of specified unlawful activity, to wit, violations of IEEPA, from a place outside the United States to or through a place in the United States and from a place in the United States to or through a place outside the United States, knowing that the funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

7. The manner and means used to accomplish the objectives of the conspiracy included, among others, that KWEK KEE SENG, the defendant, caused funds to be transmitted from outside the United States (from the originator's foreign bank) into the United States (into U.S. bank correspondent accounts) and the transfer of funds from the U.S. correspondent account outside the U.S. again (to the beneficiary's foreign bank), including through at least one account located in the Southern District of New York New York, with the intent to promote the illegal export of services to the DPRK and to North Korean SDNs, and with the intent to conceal and disguise the nature and source of the funds, which funds derived from the provision of goods and services to and for the benefit of the DPRK, the Chong Rim 2, a/k/a "Saebyol," and Ocean Bunkering JV, in violation of 50 U.S.C. § 1705(a), 31 C.F.R. §§ 510.212(a)-(b), and Executive Orders 13466 and 13722.

(Title 18, United States Code, Sections 1956(h) and 3238.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

8. I am a Special Agent with the FBI, currently assigned to the FBI's Counterintelligence Division. This Affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my

3

conversations with other law enforcement agents and other individuals. Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

9. Beginning at least in or about February 2018, KWEK KEE SENG, the defendant, engaged in an extensive scheme to evade U.S. and U.N. sanctions by covertly transporting fuel to North Korea, thereby providing a critical resource for the North Korean government and for DPRK-based companies, in violation of applicable sanctions. In connection with the scheme, KWEK and others used vessels such as Viet Tin 01, M/T Courageous, and Saebyol -- a DPRK-flagged vessel sanctioned by both the United States and the United Nations -- to transport and transfer petroleum products. For example, during a four-month period between August and December 2019, M/T Courageous stopped transmitting information regarding its location, engaged in a ship-to-ship transfer with the Saebyol, and ported in North Korea.

10. In an effort to obscure their identities and activities, KWEK KEE SENG, the defendant, and his co-conspirators used a series of shell companies, including Courage Maritime SA, a Panamanian company; Swansea Port Services, a Singaporean company; and New Eastern Shipping, a purported Chinese company. To facilitate these activities for the benefit of North Korea, and at times using the above-referenced front companies, KWEK directed payments in U.S. dollars to, among other things, purchase oil, buy M/T Courageous, and procure necessary services for the ships, including registration fees, ship materials, and salary payments for crewmembers. These payments were routed through correspondent banks located in the United States, including in the Southern District of New York, causing those banks to violate the prohibition on the export of financial services for the benefit of North Korea. Despite his awareness of U.S. and U.N. sanctions on North Korea, KWEK willfully transacted in U.S. dollars, knowing that these transactions would therefore use the U.S. financial system, while hiding behind his series of shell companies to avoid detection.

11. In March 2020, Cambodian authorities detained M/T Courageous pursuant to local law. On or about August 14, 2020, pursuant to Cambodian law, an order was issued authorizing the seizure of M/T Courageous by Cambodia for illegally accessing Cambodia's waterways in furtherance of violating sanctions imposed by the United Nations.

**The DPRK Sanctions**

12. The IEEPA, codified at Title 50, United States Code, Sections 1701-1706, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title." 50 U.S.C. § 1705(a).

13. In 2008, 2010, and 2011, the President issued a series of three Executive Orders regulating transactions with North Korea pursuant to his authorities under IEEPA. See Executive Orders 13466 (June 26, 2008); 13551 (Aug. 30, 2010); 13570 (Apr. 18, 2011). To implement Executive Orders 13466, 13551, and 13570, OFAC issued the North Korea Sanctions Regulations (the "NKSR"), 31 C.F.R. Part 510.

14. On February 18, 2016, the President signed the North Korea Sanctions and Policy Enhancement Act ("NKSPEA") to address the North Korean weapons of mass destruction threat. The NKSPEA states that the President "shall designate" as a SDN any person who "knowingly, directly or indirectly, engages in money laundering . . . that supports the Government of North Korea or any senior official or person acting for or on behalf of that Government," 22 U.S.C. § 9214(a)(6); and Congress specifically found that "[t]he Government of North Korea has been implicated repeatedly in money laundering," 22 U.S.C. § 9201(a)(3). In addition, the President "shall designate" as an SDN any person who "knowingly, directly or indirectly, provides significant amounts of fuel or supplies, provides bunkering services, or facilitates a significant transaction or transactions to operate or maintain, a vessel or aircraft that is designated under an applicable Executive order or an applicable United Nations Security Council resolution." 22 U.S.C. § 9214(a)(12). Once the executive branch designates a person, entity, or vessel as an SDN, U.S. persons or entities are prohibited from engaging in transactions for the benefit of an SDN, including by processing transactions through the U.S. financial system for the benefit of an SDN.

15. In addition to the enactment of the NKSPEA, the President issued another series of three executive orders -- Executive Orders 13687, 13722, and 13810 -- further regulating transactions with North Korea pursuant to his authorities under the IEEPA. See Executive Orders 13687 (Jan. 2, 2015); 13722 (Mar. 15, 2016); 13810 (Sept. 21, 2017). In particular, on March 15, 2016, the President issued Executive Order 13722 ("Blocking Property of the Government of North Korea and the Workers' Party of Korea, and Prohibiting Certain Transactions With Respect to North Korea") to address "North Korea's continuing pursuit of its nuclear and missile programs." Executive Order 13722 expressly prohibits:

> the exportation or reexportation, direct or indirect, from the United States, or by a United States person, wherever located, of any goods, services, or technology to North Korea;
>
> new investment in North Korea by a United States person, wherever located; and
>
> any approval, financing, facilitation, or guarantee by a United States person, wherever located, of a transaction by a foreign person where the transaction by that foreign person would be prohibited by this section if performed by a United States person or within the United States.

16. On March 5, 2018, OFAC amended the NKSR and reissued them in their entirety to implement Executive Orders 13687, 13722, and 13810, and to reference the NKSPEA. See Federal Register, Vol. 83, No. 43 (Mar. 5, 2018). The provisions of Executive Order 13722 were codified in the NKSR at 31 C.F.R. § 510.206. Section 510.405 of the NKSR elaborates on the meaning of terms in Section 510.206, and, as relevant here, provides that the prohibition on the provision of services "to North Korea" in Section 510.206 applies "where the benefit of such services is otherwise received in North Korea."

17. The international community has also taken steps to control illicit North Korean activity. The United Nations Security Council has banned all member states from allowing "their nationals, any persons subject to their jurisdiction, entities incorporated in their territory or subject to their jurisdiction, and vessels flying their flag, from facilitating or engaging in ship-to-ship transfers to or from DPRK-flagged

6

vessels of any goods or items that are being supplied, sold, or transferred to or from the DPRK." UNSCR 2375 (Sept. 11, 2017), 11. The United Nations Security Council has also banned all member states from allowing "the direct or indirect supply, sale or transfer to the DPRK, through their territories or by their nationals, or using their flag vessels or aircraft, and whether or not originating in their territories, of all refined petroleum products." Id. at 14. Although certain exceptions allow limited transfer of refined petroleum products, the United Nations requires that member states engaged in legal trade report to the United Nations "every thirty days of the amount of such supply, sale, or transfer to the DPRK of refined petroleum products along with information about all the parties to the transaction." Id.

**Kwek Directs the <u>Viet Tin 01</u> and Delivers Oil to North Korea**

18. Based upon my training, experience, participation in this investigation, and conversations with others, as well as my review of open-source information, law enforcement reports, materials seized pursuant to search warrants for electronic communications accounts, and materials seized by Cambodian authorities, I know that:

a. Singapore corporate registry records list KWEK KEE SENG, the defendant, as a director and shareholder of "Swanseas Port Services."

b. Between on or about February 8, 2018 and June 28, 2018, Swanseas Port Services made three separate U.S. dollar payments totaling approximately $22,000 to another company. The payments included notations related to the <u>Viet Tin 01</u>, stating in part, "Pmt Agency Fee for Viet Tin 01 Shipin Singapore," "Pmt for Viet Tin 01 Ship Materials," and "Pmt for Supplying Oil for Viet Tin 01 in Singapore."

c. The United Nations Panel of Experts issued a public report on the DPRK in September 2019, which stated, in part, that the <u>Viet Tin 01</u> ported in Singapore between on or about January 30, 2019 and on or about February 2, 2019, then sailed to Nampo, North Korea to deliver refined petroleum there, arriving on or about February 26, 2019.

d. On or about February 1, 2019, Swanseas Port Services paid approximately $6,908 U.S. dollars to a logistics company, bearing the memorandum line "Viettin 01 – Port."

e. An electronic storage and file-sharing account subscribed to KWEK's email address contained a photograph of a hand drawn map for the voyage of the Viet Tin 01 to Nampo, North Korea, which is dated February 1, 2019.

f. The map reflects a handwritten comment corresponding with a waypoint, bearing the message "Kwek will give instruction."

g. The top of the map bears a handwritten weekly schedule instructing the Viet Tin 01 to switch its Automatic Identification System ("AIS") signal on and off at specific times. The map states that the Viet Tin 01 should turn on the AIS daily, though only at certain times, "to receive email" and to transmit its location to the user of the map.

h. Continuous operation of AIS is a critical factor for safe ship operating, particularly for avoiding collisions with other vessels, and intentionally disabling AIS is consistent with other DPRK-related efforts to avoid sanctions.[1]

### Kwek Buys the M/T Courageous

i. On or about June 25, 2019, KWEK sent an email to an individual providing services related to M/T Courageous ("Individual-1") attaching documents regarding M/T Courageous and describing the vessel as "the Ship we buy." In the email, KWEK described his plan "to put her on the voyage under our operations."

j. In or about July 2019, KWEK spent a total of approximately $580,000 to purchase the M/T Courageous,[2] using a

---

[1] See, e.g., United States v. Bulk Cargo Carrier Known as the Wise Honest, 19 Civ. 4210 (PKC), Dkt. 1 at 32-36 (S.D.N.Y. 2019) (describing in forfeiture Complaint how seized North Korean vessel had disabled its AIS to avoid detection while evading relevant U.S. and U.N. sanctions).

[2] M/T Courageous is the current vessel name for a 2,734-ton oil products tanker ship originally built in 1987. Every cargo vessel of at least 300 gross tons is assigned a unique reference number by the IMO. Although a vessel's name can be changed by its owner, the IMO number remains connected to a ship's hull, even if the ship's ownership or flag state change. M/T Courageous is assigned IMO 8617524. Up until approximately July 19, 2019, the M/T Courageous was known under the name "Sea Prima," but still bore IMO 8617524, and was registered with the

shell company, New Eastern Shipping, that is ostensibly registered in the People's Republic of China. The bill of sale was denominated in U.S. dollars for payment.

k. The purchase of M/T Courageous was made in a series of nine separate U.S.-dollar transactions between July 8, 2019 and July 17, 2019. KWEK purchased the M/T Courageous from a company incorporated in the British Virgin Islands ("Company-1").

l. KWEK and others sent a July 17, 2019 payment for the M/T Courageous, in the amount of $78,006.33, through the correspondent account of a U.S. financial institution located in the Southern District of New York ("U.S. Bank-1"). Although the true beneficiary of the payment was correctly identified in the payment instructions, i.e., Company-1, the originator of the payment was identified as "Visson Electronics Co. Limited," and not the true originator, New Eastern Shipping. Company-1 completed the bill of sale for the M/T Courageous on July 19, 2019. The bill of sale stated that the purchase price of $580,000 in U.S. dollars was "paid to us" by New Eastern Shipping, the new owner of the ship.

m. On or about August 21, 2019, the International Ship Registry of St. Kitts and Nevis terminated the registration of the vessel bearing the IMO number of M/T Courageous. M/T Courageous was not registered with another flag state as required at that time.[3]

### The September 2019 Ship-to-Ship ("STS") Transfer By M/T Courageous

n. On or about July 19, 2019, the same day that KWEK completed his purchase of M/T Courageous, M/T Courageous was broadcasting an AIS signal in the vicinity of Kaohsiung Anchorage, in Taiwan. Between on or about July 19 and August 17, 2019, M/T Courageous continued broadcasting AIS information in the vicinity of Taiwan. During this time, personnel on the M/T Courageous provided a crew list to Taiwanese port

---

flag state of St. Kitts and Nevis. Commercially-available databases of IMO-registered vessels also include photographs of M/T Courageous.

[3] Based on my training and experience, I know that a "flag state" is the jurisdiction under the laws of which the vessel is registered or licensed. A merchant vessel must be registered, and can register in only one jurisdiction at a time.

9

authorities in Kaohsiung, Taiwan. Among other personnel, the list identified by name the Captain ("CC-1" or the "Captain") and the Chief Engineer ("CC-2" or the "Chief Engineer") of M/T Courageous.

o. For a four-month period from approximately August 17, 2019 through approximately December 8, 2019, M/T Courageous turned off its AIS signal.

p. On or about September 3, 2019, M/T Courageous and another vessel ("Vessel-1") participated in a ship-to-ship ("STS") transfer of approximately 2,871.970 metric tons of gasoline from Vessel-1 to M/T Courageous. The gasoline was purchased on or about August 3, 2019 through three separate U.S. dollar payments transmitted by three separate corporate entities, specifically, payments of $1,199,770.00, $373,522.80, and $93,363.92. The cargo clearance permit identified the carrier agent for the transaction as KWEK's "Swanseas Shipping (S) PTE Ltd."

q. On or about September 7, 2019, an individual ("Individual-2") representing a Thailand-based company that was providing services related to M/T Courageous ("Company-2") sent KWEK an email attaching two invoices. The first invoice, which was assigned number "CM/GAM-09-19-002," was for $6,786.00, and listed expenses related to the registration of M/T Courageous under a Cameroon flag. The second invoice, which was assigned number "CM/GAM-09-19-003," is for $2,800.00, and lists expenses related to hiring a marine surveyor to inspect M/T Courageous.

r. On or about September 18, 2019, Individual-2 sent KWEK an email confirming that Individual-2 had "[r]eceived your remittance," and stating that "You can start applying Cameroon as owners." The email also attached a payment confirmation from Company-2's Thailand-based bank, which indicated that Swanseas Port Services had paid Company-1 $10,809.00 in U.S. dollars in connection with a transaction processed in part by U.S. Bank-1, which is located in the Southern District of New York.

s. On or about September 25, 2019, a commercial Earth-observation satellite took a high-resolution photograph showing M/T Courageous tethered to a vessel while at sea in Korea Bay (the "September 2019 STS Transfer"). The vessel to which M/T Courageous was tethered bears several unique characteristics identifying it as the vessel assigned IMO 8916293, currently known as the "Saebyol" and formerly known as the "Chong Rim 2." The vessel bearing the IMO number of the

10

Saebyol was designated as an SDN by OFAC on or about March 16, 2016, pursuant to the NKSPEA and Executive Order 13722, for its operation in the transportation, mining, energy, and/or financial services industries in the North Korean economy. The vessel bearing the IMO number of the Saebyol is also identified as being owned by Ocean Bunkering[4] JV, a DPRK-based entity that was also named as an SDN by OFAC on or about March 16, 2016, pursuant to the NKSPEA and Executive Order 13722.

       t. A copy of a satellite photograph of the September 2019 STS Transfer is depicted below:



---

[4] "Bunkering" is a technical maritime term used to refer to the supplying of fuel for use by ships.

u.      Based on my review of the March 5, 2019 United Nations Report, I know that the September 2019 STS Transfer is consistent with the means and methods of conducting a ship-to-ship transfer of petroleum, which are a principal means by which North Korea seeks to evade U.S. and UN sanctions prohibiting such shipments to the DPRK.

v.      During the time period of the September 2019 STS Transfer, M/T Courageous was operating illegally without registration with a flag state. The St. Kitts and Nevis registration assigned to the vessel under previous ownership had been terminated on or about August 21, 2019, see supra ¶ 18(m), and the vessel was not registered with another flag state until on or about November 4, 2019, see infra ¶ 18(gg).

w.      On or about October 7, 2019, shortly after the September 2019 STS Transfer, Swanseas Port Services made a payment of $3,834.45 U.S. dollars in the name of CC-2 (the Chief Engineer) bearing the memorandum line "[CC-2] Salary Sep '19." Singapore corporate registry records list KWEK as the manager and owner of Swanseas Maritime, an entity 100% owned by Swanseas Shipping.

x.      On or about October 8, 2019, KWEK sent an email to Individual-2 stating that, "at time of delivery, we still do not register offshore company as owner, therefore you will see the bill of sales owner is New Eastern Shipping Co Ltd. Please advise me is this bill of sales valid or I have to registered [sic] another Offshore Company by the name of New Eastern Shipping Co., Ltd." Individual-2 responded that it would be possible to rearrange the ownership structure so that "Courageous Maritime SA becomes the front Owner of Ship Courageous."

**The November 2019 DPRK Port Visit By M/T Courageous**

y.      On or about November 4, 2019, a commercial Earth-observation satellite photographed M/T Courageous in close proximity to petroleum piers at the port of Nampo, DPRK (the "November 2019 DPRK Porting"). A copy of a satellite photograph of the November 2019 DPRK Porting is depicted below:



z.  According to the March 5, 2019 United Nations Report, "certain ports in the Democratic People's Republic of Korea, in particular Nampo, [serve] as hubs for suspected illegal activity," and there is "widespread use of the Marine Import Terminal at Nampo by tankers documented as engaged in illegal ship-to-ship transfers."

aa.  On or about November 13, 2019, Swanseas Port Services made a payment of $4,034.11 U.S. dollars to another individual, bearing the memorandum line "Capt [CC-1] Oct Salary."

bb.  On or about November 20, 2019, Swanseas Port Services made a payment of $4,457.60 U.S. dollars in the name of CC-2, bearing the memorandum line "[CC-2] Salary Oct '19."

cc.  On or about December 10, 2019, Swanseas Port Services made a payment of $4,034.07 U.S. dollars to another

13

individual ("Individual-3"), bearing the memorandum line "Capt [CC-1] Nov Salary." According to U.S. Customs and Border Protection records, Individual-3 entered the United States approximately one week following this payment, and identified CC-1 as Individual-3's father to U.S. customs authorities.

dd. On or about December 13, 2019, Individual-2 sent KWEK an email bearing the subject line "Fwd: BELIZE Offshore Company Registration - Courage Maritime S.A" and attaching documents referencing the front company used by KWEK to purchase the M/T Courageous, New Eastern Shipping. Individual-2 described the documents as the "word form and procedures to use to apply Belize Company for New Eastern shipping co., Ltd. The contact address has to be China as shown in the bill of sale."

ee. On or about December 27, 2019, Swanseas Port Services made a payment of $5,333.95 U.S. dollars in the name of CC-2, bearing the memorandum line "[CC-2] Salary Nov '19."

**Attempts to Conceal the Illicit Activities of M/T Courageous**

ff. On or about September 19, 2019, Individual-2 sent KWEK an email that stated the following, in substance and in part:

> Dear Mr Kwek,
>
> Good evening
>
> Received message from Cameroon deputy registra[r].
>
> Quote
>
> for tanker Sea PRIMA [i.e., M/T Courageous] I checked OFAc list and Interpol and did not find it there, but we got notification from TOGO that vessel was cancelled from St KITTS and NAVIS for suspicious activity indicative of sanctions violations - can you send to me please deletion from ST KITTS and NEVIS enable to check it to tell you final reply.
>
> Unquote

Based on my training, experience, and participation in this investigation, I believe that in the September 19, 2019 email Individual-2 conveyed a message to KWEK from the Cameroonian shipping registration authorities that, while M/T Courageous was

14

not itself identified as an SDN by OFAC, a neighboring nation, Togo, reported that M/T Courageous was "cancelled," that is, potentially de-flagged, by St. Kitts and Nevis for "suspicious activity" relating to violations of U.S. sanctions.

gg. On or about November 4, 2019, Cameroonian maritime authorities issued a provisional registration for M/T Courageous, authorizing it to sail under the Cameroonian flag.

hh. On or about January 7, 2020, Individual-2, who was representing Company-2, a Thailand-based company that was providing services related to M/T Courageous, sent an email to KWEK that stated, in part: "Dear Mr. Kwek, Good Day. Attached two invoices for payment." Both invoices were made payable to Company-2 in U.S. dollars and are made out to "Courage Maritime S.A." The invoices specifically identified Courage Maritime S.A. as "Owner of: MT COURAGEOUS."

ii. On or about January 9, 2020, Individual-2 sent KWEK an email, which stated that Individual-2 had "[r]eceived your remittance with thanks. Statement is attached." According to the payment confirmation, Company-2 received $8,691.75 in U.S. dollars from Swanseas Port Services, which U.S. Bank-1, located in the Southern District of New York, helped to process.

jj. On or about January 19, 2020, Individual-2 sent an email to CC-1 (the Captain), copying, among others, KWEK, stating "Please switch on AIS all the time as required by Cameroon Administration." In a response later that day, CC-1 (the Captain) wrote, "AIS was kept opened all the time sir." It appears this representation was false. As described above, see supra ¶ 18(o), M/T Courageous turned off its AIS signal from approximately August 17, 2019 through approximately December 8, 2019, which included the time that M/T Courageous was captured in satellite images conducting both the September 2019 STS Transfer and the November 2019 DPRK Porting. In response to the apparently false representation by CC-1 (the Captain), Individual-2 responded, in part, "Always refuse to do STS transfer with North Korea flag ships and do not go near North Korea waters."

kk. Also on or about January 19, 2020, Individual-2 sent another email to CC-1 (the Captain), asking:

> Dear Captain
>
> Good morning

> Is your ship trading or operations in North Korea waters now ?
>
> Are you using ship name Courageous now
>
> Do you have Courageous registry and certificates?
>
> Please advise to me secretly so that I can try and clear the matter
>
> When was the last time the ship was trading with
>
> North Korea ships for STS OPERATIONS

CC-1 (the Captain) forwarded the email to KWEK, asking him to "[k]indly provide the required documents."

11. On or about January 24, 2020, Individual-2 forwarded KWEK an email, which Individual-2 had received on the previous day from an individual ("Individual-4") who appears to have been employed by a broker of shipping registration services, in which Individual-4 wrote, "Regarding COURAGEOUS we need to provide Cameroon with the last 10 ports of call."

mm. The following day, on or about January 25, 2020, Individual-2 sent an email to KWEK, providing further information about the request from Cameroonian authorities for records of "the last 10 ports of call" of M/T Courageous. In the first line of the email, Individual-2 noted to KWEK that the inquiry was "[r]egarding Sea Prima [i.e., M/T Courageous] and it's owners which may have done commercial business with North Korea, some one who could be competitors had reported to Cameroon, (as if the business with North Korea was carried out recently as Courageous)." Individual-2 continued in the email to KWEK:

> North Korea is a sensitive UN issue.
>
> That is why Cameroon wants the last 10 ports list.
>
> It is a legal question according to IMO ISPS Code.[5]

---

[5] According to publicly available maritime reference documents, the term "ISPS Code" refers to the International Ship and Port Facility Security Code, an amendment to the Safety of Life at Sea Convention, which serves to, among other things, define the respective roles and responsibilities of all parties concerned

16

> Your statements and supporting documents are very important to clear this vessel to continue as a permanent Cameroon Registry. There can be a past mistake of this vessel with North Korea and my explanations are not satisfactory with the Authorities.
>
> The registry Officer was sacked because of the news with North Korea and Courageous are related.
>
> Thereby your statement is of utmost importance.

nn.     On or about February 3, 2020, KWEK sent an email to Individual-3, purporting to describe "the Statement of Fact (Time Logs) of MT COURAGEOUS (ex Sea Prima) During July – December 2019 after we take delivery at Kaohsiung Port." In the email, KWEK noted that on July 12, 2019, CC-1 (the Captain), whom KWEK identified as "Our Rep," "boarded the ship for familiarization." KWEK continued, "[f]or and on behalf of Owner (New Eastern Shipping Co., Ltd), hereby confirmed that, Ship did not go to North Korea for any Commercial Business after 19-July-2019, and we have neither intention to conduct illegal business nor sail to North Korea in the future for Commercial purpose." It appears that this representation was false. For example, as noted above, satellite imagery captured the November 2019 DPRK Porting of M/T Courageous, well after July 19, 2019. The email concluded with the signature "Sincerely Yours, Courageous Maritime S.A for and on behalf of NEW EASTERN SHIPPING Co., Ltd."

oo.     Attached to the email sent by KWEK to Individual-3 on February 3, 2020 was a document entitled "Voyage Memo." The memo purported to provide information about the activity of M/T Courageous between July 24, 2019, and December 8, 2019. The memo identified CC-1 as the captain of M/T Courageous, and bore a signature and stamped seal of "MASTER MT COURAGEOUS." According to the memo, M/T Courageous was on the "Hong Kong High Sea" between September 13, 2019 and October 1, 2019, traveling between Taiwan and Hong Kong in the South China Sea. It appears that this representation in the memo was also false. As noted above, on or about September 24, 2019, M/T

---

with safeguarding maritime security in ports and on board ships, at the national, regional and international levels. Regulation 9, Section 2.3 of the ISPS Code requires that a ship "shall keep records of the information . . . for the last 10 calls at port facilities."

Courageous was in Korea Bay conducting the September 2019 STS Transfer with the Saebyol, see supra ¶ 18(s). Despite purporting to cover a period ending in December 2019, the memo also omitted mention of the M/T Courageous's DPRK Porting in November 2019.

pp. On or about February 18, 2020, KWEK sent an email to Individual-2 with documents that KWEK indicated he "would like to send [to the] registrar." KWEK included an affidavit from an individual purporting to represent New Eastern Shipping ("CC-3"), dated January 21, 2020, to the Ministry of Transport of the Republic of Cameroon, Department of Maritime Affairs and Inland Waterways. CC-3's affidavit stated: "Hereby, I/We, NEW EASTERN SHIPPING CO.,LTD, as owner, represented by its Director, [CC-1 (the Captain)] confirmed that The Ship name MT COURAGEOUS IMO No. 8617524 under Cameroon Registry did not go to North Korea for any commercial businesses." It appears that this representation in CC-3's affidavit was false. M/T Courageous was registered with Cameroon authorities on or about November 4, 2019. See supra ¶ 18(gg). On the same day, the M/T Courageous was located in port in Nampo, DPRK in connection with the November 2019 DPRK Porting. See supra ¶ 18(y).

**The Detention and Seizure of M/V Courageous in Cambodia**

qq. In or about March 2020, Cambodian authorities detained the M/T Courageous pursuant to Cambodian law.

rr. On or about April 2, 2020, the Honorable Sarah L. Cave, United States Magistrate Judge, issued a warrant, pursuant to 18 U.S.C. § 981, authorizing the seizure of M/T Courageous.

ss. Beginning in or about March 2020, Cambodian authorities searched M/T Courageous pursuant to Cambodian law and seized, among other things, records indicating that M/T Courageous had falsely identified itself as another ship, the "Sea Cheetah," a/k/a "Sea Cheeta." For example, the following records were found onboard M/T Courageous:

i. A "Crew Personnel Currency List" dated November 1, 2019, identified the port as "Namp'o" (consistent with the November 2019 DPRK Porting), and listed crew members, their ranks, and their salaries in U.S. currency under the vessel name "SEA CHEETA." This list matched the crew list for M/T Courageous supplied to Taiwanese authorities, see supra ¶ 18(n). Commercially available shipping reports reflect that

18

there is an India-flagged vessel genuinely registered under the name "Sea Cheetah," which was located in India from September to November 2019, not Nampo, North Korea.

        ii.    A letter agreement dated September 13, 2019, between the "MT. SEA CETAAH" and an unspecified vessel identified the "Sea Cheetah" "chief officer" ("CC-4"), and set forth an agreement consistent with a planned high seas ship-to-ship transfer, such as the density in vacuum and density in air prior to the discharging and loading of cargo. The September 2019 STS Transfer occurred less than two weeks after the date on the letter.

        iii.    A September 26, 2019 letter of resignation signed by CC-4, approximately one day after the September 2019 STS Transfer, which identified CC-4 as the "chief officer" of the "MT. SEA PRIMA," that is, <u>M/T Courageous</u>.

WHEREFORE, the deponent respectfully requests that a warrant issue for the arrest of KWEK KEE SENG, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

/s/Kevin Samaroo   with permission JLC
_____
KEVIN SAMAROO
Special Agent, FBI

Sworn to me through the
transmission of this Affidavit
by reliable electronic means, pursuant to
Federal Rule of Criminal Procedure 4.1,
<u>23rd</u> day of April, 2021

_____
JAMES L. COTT
United States Magistrate Judge